# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Corey Bevins,                                    Civ. No. 16-4340 (NEB/BRT)

        Plaintiff,

v.                                               **REPORT AND**
                                                 **RECOMMENDATION**

Becker County, Minnesota; Becker County Jail;
Becker County Sheriffs Department;
Unknown Becker County Sheriff;
St. Mary's Regional Health Center; Innovise Health, LLC;[1]
Donald Nelson; John W. Freeman; Paula Peterson;
and Randy Hodgson,

        Defendants.

---

Corey Bevins, 17941-041, Federal Correctional Institution, P.O. Box 2000, Unit 5703, Fort Dix, NJ, 08640, *pro se* Plaintiff.

Angela E. Lord, Esq., and Charlotte Rusch, Esq., Vogel Law Firm, counsel for Defendants St. Mary's Regional Health Center and Innovis Health, LLC.

Anna L. Yunker, Esq., and William J. Everett, Esq., Everett & VanderWiel, PLLP, counsel for Defendants Becker County, Becker County Jail, Becker County Sheriffs Department, Unknown Becker County Sheriff, Donald Nelson, John W. Freeman, Paula Peterson, and Randy Hodgson.

---

BECKY R. THORSON, United States Magistrate Judge.

    *Pro se* Plaintiff Corey Bevins brings federal and state law claims related to the medical treatment he received while detained at Becker County Jail from January 14, 2014 until April 29, 2014. (*See* Doc. Nos. 24, 68, 100.) During this time frame, Plaintiff

---

[1]     The correct spelling for this Defendant is Innovis Health, LLC. The Court recommends that the spelling be corrected on the docket.

was treated for a variety of medical issues at St. Mary's Hospital and other St. Mary's facilities in Detroit Lakes, Minnesota. Plaintiff is suing two groups of Defendants: the Becker County Defendants[2] and the St. Mary's Defendants (St. Mary's Regional Health Center and Innovis Health, LLC). Both groups of Defendants move for summary judgment. (Doc. Nos. 120, 126.) For the reasons stated below, this Court recommends that both motions be granted.

## I.    Procedural History

This matter was initially filed in the United States District Court for the Northern District of Ohio. It was transferred here on December 20, 2016. (Doc. No. 4.)

On July 7, 2017, St. Mary's Regional Health Center moved to dismiss for improper service. (Doc. No. 34.) St. Mary's argued that its President had been served with a Summons issued to "Essentia Health-St. Mary's Hospital," which does not exist as a legal entity. (*See id.*) On October 27, 2017, this Court issued a Report and Recommendation that the motion to dismiss be denied. (Doc. No. 71.) The Court reasoned that Plaintiff had sued the correct Defendant (St. Mary's Regional Health Center) by the wrong name (Essentia Health-St. Mary's), and that there was no prejudice due to the misnomer. (*Id.* at 3–5.) The Court also recommended that the claims against one of the Becker County Defendants, listed in the caption as "Randy Hodges," be dismissed for failure to prosecute. (*Id.* at 7–8.)

---

[2]    The Becker County Defendants include Becker County, Minnesota, Becker County Jail, Becker County Sheriffs Department, Unknown Becker County Sheriff, Donald Nelson, John W. Freeman, Paula Peterson, and Randy Hodgson.

On January 23, 2018, United States District Judge Donovan W. Frank adopted this Court's Recommendation that St. Mary's Regional Health Center's motion to dismiss be denied. (Doc. No. 94.) Judge Frank also directed Plaintiff to file a two-page amendment stating that "Randy Hodgson" is substituted for "Randy Hodges" in the Second Amended Complaint. (*Id.*) Plaintiff filed the requested amendment on February 9, 2018. (Doc. No. 100.) In that amendment, Plaintiff also asked the Court to add Innovis Health to the complaint. (*Id.*) The Court granted this request on February 28, 2018. (Doc. No. 102.) Hodgson executed a waiver of service on March 16, 2018, and Innovis Health was served with process on April 13, 2018. (Doc. Nos. 113, 138.) Defendants Hodgson and Innovis Health have now appeared in this action.

Plaintiff's Second Amended Complaint, filed on May 8, 2017, is the operative complaint in this matter, supplemented by amendments adding or subtracting various parties, as discussed herein. (*See* Doc. Nos. 24, 68, 100.)

## II.    Plaintiff's Allegations

Plaintiff alleges that the Becker County Defendants "blatantly and purposefully neglected" his medical needs, resulting in two lengthy stays in the Intensive Care Unit at Defendant Essentia Health-St. Mary's Hospital, where "at one point Plaintiff was given last rites by a Roman Catholic priest." (Doc. No. 24, Second Am. Compl. 2.) Immediately following his arrest, according to Plaintiff, he was placed in what he calls the "drunk tank," and Jail Staff ignored Plaintiff's medical needs for twelve hours before taking him to the hospital. (*Id.* 3.) After his first discharge from the hospital, Plaintiff alleges that Defendants in the Becker County Jail Medical Department failed to follow

3

discharge instructions, requiring a second hospital stay. (*Id.* 2.) Plaintiff further alleges that the Becker County Defendants: (1) refused to allow him to file administrative grievances, tearing them up in front of Plaintiff and laughing at him; (2) repeatedly threatened him physically; (3) failed to administer prescription medications; and (4) denied Plaintiff medical treatment after being bitten by a spider, which resulted in "prominent facial swelling." (*Id.* 2–6.) Regarding the St. Mary's Defendants, Plaintiff alleges that their culpability is limited to making discharge decisions based on the demands of the Jail, rather than his medical needs, and failing to follow-up on Plaintiff's condition following his discharge. (*Id.* 8.) Plaintiff requests judgment in the amount of $1,000,000.00, plus costs and punitive damages. (*Id.* 9.)

## III.  Factual Background[3]

On January 14, 2014, Plaintiff was arrested and transported to Becker County Jail, where he was booked at approximately 6:36 p.m. (Doc. No. 129, Affidavit of Paula Peterson ("Peterson Aff.") ¶ 12, Ex. 5 at 1; Doc. No. 132, Declaration of Anna L. Yunker ("Yunker Decl.") ¶ 3, Ex. 2, Bevins Dep. 30:10–31:13; *see also* Doc. No. 122, Affidavit of Janna Sagvold ("Sagvold Aff."), Ex. 3.)[4] Plaintiff had consumed approximately one liter of whiskey. (Bevins Dep. 34:9–24.) A preliminary breath test showed that his blood

---

[3]    The following facts are taken from materials offered in support of Defendants' summary-judgment motions. Unless otherwise noted, they are undisputed.

[4]    Plaintiff was arrested for First-Degree Criminal Sexual Conduct. (Peterson Aff. ¶ 12, Ex. 5 at 1.) He is currently serving a 300-month sentence. (Yunker Decl. ¶ 2, Ex. 1 at 1–2.)

alcohol content was .079. (*Id.* at 33:3–12.) The arresting officer, Officer Joseph

McArthur, alerted Jail staff that Plaintiff was an alcoholic and might go into withdrawal.

(Peterson Aff. ¶ 13, Ex. 6.) Plaintiff was placed in a medical observation cell to monitor

him for signs of withdrawal or other health problems. (Bevins Dep. 33:16–20, 74:13–

76:21.) Plaintiff does not dispute that he was observed. In his opposition memorandum,

Plaintiff states that he "did not have stomach pain until after he was incarcerated in

Becker County Jail." (Doc. No. 157, Def.'s Mem. 1.) He also explains that he "was never

checked on or even asked if he was ok. Not once did a guard open the door or trap to ask

the Plaintiff if he was ok. After the 12 hours elapsed the guard opened the door and told

Plaintiff to cuff up. He was never asked if he was ok or if he thought he needed medical

attention." (*Id.* at 1–2.) It is undisputed that, over the twelve-hour period, Plaintiff

experienced gradually increasing abdominal pain, nausea, and vomiting. (Bevins Dep.

38:24–39:6; Bevins Dep., Ex. 7 at 3–4.) Plaintiff testified that he did not want to go to the

hospital. (*Id.* at 49:25–50:23.) Plaintiff "just thought he was sick" and did not believe his

condition was serious. (*Id.* at 50:19–23.) Jail staff took Plaintiff to the emergency room at

approximately 6:30 a.m. on January 15, 2014, and he was admitted to the hospital. (*Id.* at

36:20–37:20.)[5]

---

[5]     Plaintiff was taken to the St. Mary's Hospital in Detroit Lakes, Minnesota. (*See*
Bevins Dep., Ex. 7.) For his follow-up care and second hospitalization, discussed below,
Plaintiff was treated at various St. Mary's facilities. (*See id.*; Doc. No. 132-2 at 72–204.)
These facilities are also under the rubric of Essentia Health. (*See* Bevins Dep., Exs. 1–
25.)

At the hospital, Plaintiff was diagnosed with dehydration and pancreatitis. (Bevins Dep., Ex. 7 at 3.) The diagnosis was later amended to alcoholic hepatitis and gastritis. (Bevins Dep., Ex. 8 at 1.) Plaintiff spent approximately two days in the hospital. (Bevins Dep. 37:21–38:9.) Plaintiff was discharged because he was feeling better, had been able to tolerate solid food, and was no longer manifesting any symptoms of alcohol withdrawal. (Bevins Dep., Ex. 8 at 1.)

Doctors at the hospital prescribed Plaintiff four vitamins (calcium, phosphate, folic acid, and thiamine) and an acid suppressant (omeprazole). (*Id.*) The Jail ordered the medications prescribed for Plaintiff and the prescription was filled on January 18, the day after Plaintiff's discharge. (Peterson Aff. ¶ 14, Ex. 7 at 1.) The Becker County Jail distributes medication to inmates between two and four times per day. (Peterson Aff. ¶ 9; Bevins Dep. 108:22–109:3.) According to the medication log, Plaintiff took his medication each day from January 18 to January 25. (Peterson Aff. ¶ 10, Ex. 3.)

On January 20, 2014, Plaintiff was seen by Dr. Pankaj Timsina at Essentia Health, DLC Family Medicine in Detroit Lakes. (Bevins Dep. 57:9–58:25; Bevins Dep., Ex. 12 at 11.) Dr. Timsina concluded that Plaintiff was "doing fine" and was no longer experiencing symptoms. (Bevins Dep. 57:9–58:25; Bevins Dep., Ex. 12 at 13–14.) Plaintiff told Dr. Timsina he had been taking the medications that were prescribed for him when he was at the hospital. (Bevins Dep., Ex. 12 at 11, 14.) Blood tests showed Plaintiff's levels of calcium, thiamine, phosphate, and folic acid were still within the normal range. (Doc. No. 131, Declaration of Daniel McKee ("McKee Decl.") ¶ 2, Ex. 1 at 2–3.) Dr. Timsina did not raise any concerns regarding Plaintiff's medications or his

6

calcium, folic acid, phosphate, and thiamine levels, and Dr. Timsina stated there was "no

need of adding any medications." (Bevins Dep., Ex. 12 at 14.)

On January 22, 2014, two days after his appointment with Dr. Timsina, Plaintiff

submitted a Sick Call Request Form to Jail staff, indicating that he was experiencing

intermittent severe side and stomach pain. (Bevins Dep. 62:12–63:4, 81:24–82:4.) On

January 23, Plaintiff called his mother from the Jail. (Peterson Aff. ¶ 11, Ex. 4.) Plaintiff

told her that the Jail had given him ibuprofen for his stomach pain. (*Id.* at 0:29–0:39;

Doc. No. 133, Affidavit of Trina L. Ness ("Ness Aff.") ¶ 2, Ex. 1 at 1.) He also told his

mother that the medications prescribed after his hospitalizations had run out and that he

was waiting for a refill. (Peterson Aff., Ex. 4 1:24–1:31; Ness Aff., Ex. 1 at 2.)

On January 24, a nurse at the Jail called Dr. Timsina's office at 8:31 a.m. on

January 24 to report Plaintiff's symptoms and request direction. (Bevins Dep., Ex. 14;

Ex. 15 at 4.) After exchanging several voicemail messages, the nurse spoke with Dr.

Monica Pokharel at 5:56 p.m. on Saturday, January 25. (Bevins Dep., Ex. 15 at 2.) Dr.

Pokharel instructed the Jail could provide one dose of Tylenol or ibuprofen if necessary.

(*Id.*) Dr. Pokharel also advised that if the pain continued, Plaintiff should return to the

clinic on Monday morning, January 27. (*Id.*)

Shortly after the nurse at the Jail spoke to Dr. Pokharel, Jail staff noticed Plaintiff

had vomited in his cell and went in to check on him. (Bevins Dep. 79:12–80:14.) Plaintiff

tried to hide the vomit from Jail staff because he did not want to be held in the medical

observation cell or taken back to the hospital, but he was not able to flush the toilet

quickly enough to prevent them from seeing it. (*Id.* at 74:23–75:20, 79:12–80:14,

7

111:12–112:21.) After seeing there was blood in the vomit, Jail staff took Plaintiff to the emergency room. Plaintiff was admitted to the hospital on January 25 at approximately 7:22 p.m.—less than 90 minutes after the nurse at the Jail had spoken with Dr. Pokharel. (*Id.* at 69:5–20.)

Plaintiff was admitted to the hospital with "vague abdominal pain," though his abdominal exam was "relatively unremarkable." (Bevins Dep., Ex. 17 at 2.) Plaintiff spent two days at the hospital. (*Id.* at 1.) During that time, Plaintiff was diagnosed with acute recurrent pancreatitis, acute gastritis, and uncontrolled hypertension. (*Id.*) He was discharged in the afternoon on January 28, 2014. (*Id.*) At the time of discharge, doctors noted that Plaintiff "was feeling much better"; that he still had some "vague tenderness in his upper abdomen," but "seemed to exaggerate the pain." (*Id.* at 2.) Plaintiff was prescribed oxycodone for pain and metoprolol for his high blood pressure. (*Id.* at 3.) Plaintiff's omeprazole prescription was adjusted and his vitamin prescriptions were discontinued. (*See id.*)

On February 12, 2014, Jail staff took Plaintiff to another follow-up appointment. (Bevins Dep. 89:7–21; Bevins Dep. Ex. 18 at 1.) During that appointment, Plaintiff reported that he was taking his omeprazole daily. (Bevins Dep. 90:1–15.) Dr. Timsina noted Plaintiff's blood pressure was under control, but he was still experiencing some stomach pain. (Bevins Dep. Ex. 18 at 15.) Dr. Timsina amended his diagnosis to chronic pancreatitis. (*Id.*)

On February 12 and 19, 2014, Plaintiff met with a social worker from Lakeland Mental Health Center at the Jail. (Peterson Aff. ¶ 15, Ex. 8 at 1–2.) Plaintiff reported he

8

had been "feeling 'helpless' and 'hopeless' regarding his situation of incarceration." (*Id.*) The social worker opined that Plaintiff would benefit from an antidepressant but, as a social worker, did not have the authority to give him a prescription. (*See id.*)

On February 24, 2014, Plaintiff met with a nurse at the Jail to discuss his concerns about his mental health. (*Id.*, Ex. 8 at 3.) He told the nurse he thought an antidepressant had been prescribed for him, and asked why it had not yet arrived. (*Id.*) The nurse contacted Dr. Timsina and inquired about the prescription. (*Id.*) Dr. Timsina responded that Plaintiff was mistaken—an antidepressant had not been prescribed. (*Id.*) Dr. Timsina declined to issue a prescription for an antidepressant at that time. (*Id.*)

On March 24, 2014, Plaintiff submitted a Sick Call Request Form reporting that an area above his lip was swollen. (Bevins Dep. 129:4–25; Bevins Dep., Ex. 21.) Plaintiff believed he had been bitten by a spider overnight. (Bevins Dep. 129:15–25.) A nurse at the Jail examined Plaintiff's face and noted that while there was "slight swelling" on the left side of Plaintiff's face, there were no signs of infection and no redness. Plaintiff denied suffering from any oral pain or sores. (Bevins Dep., Ex. 21; Bevins Dep. 132:3–135:3.) The nurse authorized ibuprofen four times per day and an ice pack for his face three times per day. (Bevins Dep., Ex. 21.)

Throughout the night of March 24, a corrections officer checked on Plaintiff every two hours and measured the swelling to determine if it was getting worse. (Bevins Dep. 132:3–135:3.) When the swelling did not improve, the corrections officer made arrangements for Plaintiff to be seen by a doctor the next morning. (*Id.* at 134:7–24.) Plaintiff arrived at urgent care at 9:01 a.m. the next morning. (*Id.* at 131:4–21; Bevins

9

Dep., Ex. 22 at 9.) Plaintiff was diagnosed with cellulitis and prescribed an antibiotic and pain medication. (Bevins Dep., Ex. 22 at 11; Bevins Dep. 135:9–25.) The Jail ordered the prescriptions and Plaintiff received his first dose the same day. (Bevins Dep. 136:6–13.) The swelling gradually disappeared over the next four weeks, and Plaintiff's cellulitis is now fully resolved. (*Id.* at 138:13–21, 139:2–5.)

Plaintiff was transferred to federal custody on April 29, 2014. (Bevins Dep. 155:6–156:12.)

## IV.    Becker County Jail Grievance Procedure

The Becker County Jail Grievance Procedure is outlined in the Becker County Detention Facility Inmate Handbook. (Peterson Aff. ¶ 3, Ex. 1 at 24–25.) During the time Plaintiff was at the Jail, the Handbook was kept in the facility's dayroom, where it was readily available to the inmates. (Peterson Aff. ¶ 6.) The first step in the exhaustion or grievance process is presentation of a written grievance to a Correctional officer. (*Id.* ¶ 3.) If an inmate is unsatisfied with the Correctional Officer's response, the inmate can submit the grievance to the Shift Supervisor, then to the Assistant Head Jailer, and then to the Jail Administrator. (*Id.*) Finally, if the inmate remains unsatisfied after taking these steps, the inmate can submit the grievance to the Sheriff. (*Id.*)[6] Jail records indicate that

---

[6]     The Handbook states as follows:

GRIEVANCE PROCEDURE:

A.     A grievance procedure shall exist for inmates to file written complaints concerning personal health and welfare or the operations and

(Footnote Continued on Next Page)

Plaintiff did not submit any written grievances pursuant to this Grievance Procedure. (*Id.*

¶ 7.)

## IV.   Analysis

### A.   Plaintiff's Claims

Plaintiff brings the following federal constitutional claims pursuant to 42 U.S.C.

§ 1983: (1) deliberate indifference to medical needs; (2) procedural due process violation;

and (3) conspiracy to violate his constitutional rights. (*See* Second Am. Compl.)

Plaintiff's Complaint can also be construed as alleging a claim against Becker County for

---

(Footnote Continued From Previous Page)

services of the Jail Facility. The following Chain of Command procedure shall be used.

1.    Present your grievance, in writing, to the on-duty Correctional Officer; he/she will attempt to rectify the situation.

2.    If you are not satisfied with the Correctional Officer response, direct a written grievance to the Shift Supervisor. If you are not satisfied with this response, ask to have it presented to the Assistant Head Jailer followed by the Jail Administrator.

3.    If you are not satisfied with this response, you can send a written grievance to the Sheriff.

B.    All responses to grievances will be in writing and returned to you within five (5) days excluding weekends and holidays.

C.    The use of the grievance process does not prevent you from seeking legal remedies.

D.    You must sign any grievance that is submitted.

(Peterson Aff., Ex. 1 at 24–25.)

enacting unconstitutional policies, customs, and practices. (*See id.*) Finally, Plaintiff brings state law claims for negligence and medical malpractice. (*See id.*)

The Becker County Defendants argue that they are entitled to summary judgment on Plaintiff's § 1983 claims for a variety of reasons, including Plaintiff's failure to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). (Doc. No. 128, Becker County Defs.' Mem. 10–15.) The St. Mary's Defendants argue that they are entitled to summary judgment on Plaintiff's § 1983 claims because they are not state actors. (Doc. No. 121, St. Mary's Mem. 6–7; Doc. No. 148, Innovis Health's Mem. 6–7.) The Becker County Defendants and the St. Mary's Defendants also request summary judgment on the supplemental state law claims. (Becker County Defs.' Mem. 34–36; St. Mary's Mem. 7–20.)

**B.    Standard of Review**

Summary judgment is appropriate if, "after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law." *Johnson v. Carroll*, 658 F.3d 819, 825 (8th Cir. 2011) (quotation omitted). In ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A disputed fact is material when its resolution "might affect the outcome of the

suit under the governing law," and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying "those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2001) (quotations omitted). If it does so, the non-moving party may not rest on mere allegations or denials, but must point to evidence of "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256; *see also* Fed. R. Civ. P. 56(c)(1). Conclusory assertions, standing alone, are not enough to create a genuine issue of material fact. *See Bennett v. Nucor Corp.*, 656 F.3d 802, 820 (8th Cir. 2011). Where the evidence "could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted).

When deciding a summary judgment motion, courts liberally construe pro se pleadings and hold them to a less stringent standard than those drafted by attorneys. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Nevertheless, a pro se plaintiff's claims cannot survive a summary judgment motion unless he has set forth specific facts demonstrating that there is a genuine issue for trial. *See Quam v. Minnehaha Cnty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987). Arguments and statements in briefing are not evidence and cannot create issues of fact for purposes of summary judgment. *See Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 467 n.6 (8th Cir. 2002).

13

C.    **Federal Claims Against the Becker County Defendants**

1.    **Exhaustion of Administrative Remedies**

Under the PLRA, "[n]o action shall be brought with respect to prison conditions
under section 1983 of this title, or any other Federal law, by a prisoner confined in any
jail, prison, or other correctional facility until such administrative remedies as are
available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement "applies to
all inmate suits about prison life, whether they involve general circumstances or
particular episodes, and whether they allege excessive force or some other wrong."
*Porter v. Nussle*, 534 U.S. 516, 532 (2002). This is because the purpose of the PLRA is to
reduce the quantity of prisoner lawsuits by giving prison administration an opportunity to
take corrective action in response to a prisoner's grievance, thereby avoiding the need for
court intercession. *Id.* at 524–25. Prisoners must exhaust administrative remedies even
where the relief sought, such as monetary damages, cannot be granted by the
administrative process. *Woodford v. Ngo*, 548 U.S. 81, 85 (2006). When a plaintiff fails
to exhaust the administrative remedies available to him before filing a lawsuit, "dismissal
is mandatory." *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003).

In *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016), the Court clarified that there are no
"judge-made" exceptions, such as good cause, to the PLRA's exhaustion requirement.
Instead, a prisoner must exhaust all "available" remedies, which the Court narrowly
defined as all remedies that are "capable of use." *Id.* at 1858. The Court then emphasized
that administrative remedies are "unavailable" only under three limited circumstances
which "will not often arise": (1) when the process cannot be completed because it is a

14

"dead end," with prison officials "unable or consistently unwilling" to provide any relief; (2) when the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) when prison officials thwart the inmate through "machination, misrepresentation, or intimidation." *Id.* at 1859–60.

Plaintiff asserts that he prepared a written grievance complaining that he did not receive his medications in a timely manner, but when Plaintiff handed the grievance to a Correctional Officer, the officer told Plaintiff that he could file "all the grievance forms he wanted, but nothing would be done," then crumpled up the form and laughed at him. (Second Am. Compl. 5; Bevins Dep. at 146:5–16.) The Becker County Defendants dispute these allegations. Assuming these allegations are true, they are insufficient to create an issue of fact as to whether administrative remedies were available to Plaintiff. The Becker County Jail Grievance Procedure establishes that inmates must present their grievance up the chain of command if they are unsatisfied with the response, and it is undisputed that Plaintiff did not escalate his grievance beyond presenting it to a Correctional Officer. (Doc. No. 130, Affidavit of Todd Glander ("Glander Aff.") ¶ 5; Peterson Aff. ¶ 7.) Thus, there is no fact issue as to whether Plaintiff could have obtained relief at any other step, and the administrative remedy established by the Grievance Procedure remained available to Plaintiff even if, as he alleges, the Correctional Officer refused to entertain his grievance. *See Woodford*, 548 U.S. at 90 (stating that "proper exhaustion" of administrative remedies "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)"). At best, the alleged comments by the Correctional Officer were a prediction that Plaintiff would

15

lose if he complained, not a denial of his right to complain. *See Lyon v. Vande Krol*, 305 F.3d 806, 809 (8th Cir. 2002) (prediction that prisoner would lose grievance "was not a denial of [the prisoner's] right to complain, nor could the statement have misled him about the availability of the procedure").[7]

Plaintiff also alleges that further requests for grievance forms were denied. (Second Am. Compl. 5.) In *Miller v. Norris*, the Eighth Circuit held that an inmate was prevented from exhausting administrative remedies when prison officials failed to respond to his requests for grievance forms, and that the inmate's failure to exhaust those remedies was not a bar to suit because the remedies were not "available" to him. 247 F.3d 736, 740 (8th Cir. 2001). *Miller* is distinguishable because the Grievance Procedure requires only that grievances be in writing, not that they be submitted on a particular form. (*See* Peterson Aff., Ex. 1 at 24–25; *see also* Peterson Aff. ¶ 5 (stating grievances not on grievance form are routinely submitted and accepted); Doc. No. 130, Affidavit of Todd D. Glander ("Glander Aff.") ¶ 3 (same).) Therefore, the alleged refusal to provide grievance forms did not render the Grievance Procedure unavailable to Plaintiff. *See, e.g.*, *Mayes v. Valdez*, No. 3:16-cv-343-L-BN, 2017 WL 722206, at *3 (N.D. Tex. Jan. 11, 2017) (rejecting argument that administrative remedies were not available for prisoner unable to obtain grievance forms because "the record reflects that the submission of a

---

[7]     Even if the Court were to find that Plaintiff fully exhausted his administrative remedies as to the claim pertaining to his medications, Plaintiff's other claims would still be subject to dismissal. *See Jones v. Bock*, 549 U.S. 199, 220 (2007) (where there is a mix of exhausted and unexhausted claims, only the exhausted claims may proceed); *see also Kozohorsky v. Harmon*, 332 F.3d 1141, 1144 (8th Cir. 2005).

grievance . . . need not be made on a particular form"); *Hentschel v. Rockingham Cnty. Dep't of Corr.*, Case No. 15-cv-215-SM, 2016 WL 6956719, at \*4 (D.N.H. Oct. 26, 2016) ("[N]otwithstanding his reference to an unsuccessful attempt to obtain a grievance, the RCDC rules and regulations do not appear to require formal/written grievances to be submitted on any particular form.").[8]

Therefore, Plaintiff's federal claims are subject to dismissal because he failed to exhaust his administrative remedies. Normally, failure to exhaust results in dismissal without prejudice, but dismissal should be with prejudice when the remedies once available to the inmate are no longer available. *See Fisherman v. Rasmussen*, Civil No. 12-2554 (JRT/JSM), 2013 WL 3354509, at \*9 (D. Minn. July 3, 2013). Here, the remedies are no longer available to Plaintiff because he is not detained at the Becker County Jail, and the grievance procedure by its terms only applies to inmates that are currently incarcerated. *See id.* In other words, a former inmate cannot file a grievance to correct or remedy his previous failure to exhaust. Because Petitioner "can no longer exhaust his claims, he has procedurally defaulted on them and his suit is forever precluded and must be dismissed with prejudice." *Id.* (citing *Woodford*, 548 U.S. at 92–

---

[8] In his response to the pending motions, Plaintiff changes course and argues that he "filed numerous grievances" but they were all "destroyed." (Doc. No. 157, Pl.'s Mem. 3.) This argument contradicts Plaintiff's initial argument that his requests for grievance forms were simply denied. In any event, Plaintiff's vague assertion, which is not supported by any admissible evidence, is insufficient to evade summary judgment. Once again, it is undisputed that Plaintiff did not escalate his grievance up the chain of command, and Plaintiff does not offer any evidence to the contrary.

93). As a result, Plaintiff procedurally defaulted his claims, and they should be dismissed with prejudice.[9]

## 2.    Deliberate Indifference to Medical Needs: Qualified Immunity

The Becker County Defendants argue that they are entitled to qualified immunity on Plaintiff's deliberate indifference claims. To overcome an assertion of qualified immunity, a plaintiff "must present sufficient facts to show not only (1) that the officer's conduct violated a constitutional right, but also (2) that the right was clearly established at the time of the alleged violation." *Tatum v. Robinson*, 858 F.3d 544, 547 (8th Cir. 2017). The Becker County Defendants are entitled to qualified immunity because their conduct did not violate Plaintiff's constitutional rights.

The Eighth Amendment[10] prohibition of cruel and unusual punishment prohibits deliberate indifference to prisoners' serious medical needs. *Luckert v. Dodge Cnty.*, 684 F.3d 808, 817 (8th Cir. 2012). To prevail on his claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Whether an official was deliberately indifferent

---

[9]    If the district court finds that Plaintiff failed to exhaust his administrative remedies, it would not be necessary to address the Becker County Defendants' alternative arguments for summary judgment on Plaintiff's federal constitutional claims. This Court will address those arguments below.

[10]    Since Plaintiff was a pretrial detainee when he was at the Becker County Jail, Plaintiff's claims are properly analyzed under the Due Process Clause of the Fourteenth Amendment. *See Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012). Even so, "the due process analysis applicable in this situation parallels that under the Eighth Amendment, because pretrial detainees are entitled to the same protection as imprisoned convicts." *Id.*

requires both an objective and a subjective analysis." *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014). The objective prong requires the Plaintiff to "establish he suffered from an objectively serious medical need. Under the subjective prong, Plaintiff must show that an official actually knew of but deliberately disregarded his serious medical need." *Id.* For the subjective prong, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation." *Popoalii v. Correctional Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008). "The subjective inquiry must show a mental state akin to criminal recklessness: disregarding a known risk to the inmate's health." *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006). An inmate "must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." *Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010).

　　Plaintiff alleges that the Becker County Defendants were deliberately indifferent because twelve hours passed from when he was initially booked until he was taken to the hospital. (Second Am. Compl. 3.) During the twelve-hour period, Plaintiff was monitored in a medical observation cell for signs of withdrawal or other health symptoms. (Bevins Dep. 33:16–20, 74:13–76:21.) During this time, Plaintiff experienced gradually increasing abdominal pain, nausea, and vomiting. There is no evidence that Plaintiff's condition at the beginning of the twelve-hour period required hospitalization. Plaintiff has not offered any evidence that he had symptoms warranting hospitalization at any time before the Becker County Defendants took him to the emergency room. In fact, Plaintiff

admitted in his deposition that he told his mother (after his discharge, but before

commencing this action) that he "hadn't wanted to go to the hospital." (Bevins Dep. 50.)

Plaintiff explained, "I didn't think there was nothing wrong with me at the moment. I just

thought I was sick." (*Id.*) In his opposition brief, however, Plaintiff asserts that for "12

hours" he "was never checked on or even asked if he was ok." (Pl.'s Mem. 1–2.)

Arguments and statements in briefing are not evidence and cannot create issues of fact.

*See Stone*, 293 F.3d at 467 n.6. Even accepting that Jail staff did not physically enter his

cell or ask him "if he was ok," Plaintiff has failed to present specific facts sufficient to

raise a genuine issue for trial as to whether the Becker County Defendants acted with

gross negligence prior to taking Plaintiff to the hospital.

Plaintiff also argues that there were delays in receiving various medications.

(Second Am. Compl. 3–5.) The evidence demonstrates, at most, that Plaintiff had to wait

48 hours to receive some of his prescribed medications. (*See* Bevins Dep. 103:16–108:6

(admitting that the delay in receiving prescribed medications after his second

hospitalization was no more than two days).)[11] Moreover, Plaintiff cannot point to any

evidence that he was actually harmed. Instead, blood tests from Plaintiff's follow up

appointments on January 20 and February 27, and during his second hospitalization,

showed his nutrient levels were in the normal range. (Doc. No. 131, Declaration of

Daniel McKee ("Mckee Decl."), Ex. 1 at 2–3; Bevins Dep., Ex. 25 at 9–10.) Plaintiff's

---

[11]     Plaintiff argues that Jail staff were deliberately indifferent for not filling a
prescription for antidepressants, but Plaintiff has not produced any evidence that he
received such a prescription. (Bevins Dep. 22:18–21.)

blood pressure was also deemed under control during a February 12 appointment. (Bevins Dep., Ex. 18 at 15.) This claim therefore fails on the merits as well. *See Moots v. Lombardi*, 453 F.3d 1020, 1023 (8th Cir. 2006) (holding that deliberate indifference claim failed because plaintiff could not show how he suffered any harm as a result of temporary delay in receiving medication); *Baez v. Rosemack*, No. 09-CV-2121 (RHK/LIB), 2011 WL 4062586, at *7 (D. Minn. Aug. 9, 2011).[12]

For the foregoing reasons, Plaintiff failed to create an issue of fact as to whether any of the Becker County Defendants were deliberately indifferent to his serious medical needs. Therefore, even if Plaintiff did not procedurally default his claims by failing to exhaust the Jail's administrative remedies, the Becker County Defendants are entitled to qualified immunity on this claim.

### 3. Procedural Due Process

"Procedural due process imposes constraints on government decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). To demonstrate that his procedural due process rights have been violated, Plaintiff must prove (1) that he had a protected liberty or property interest at stake, and (2) that Defendants deprived Plaintiff of this interest without due process of law. *See Hopkins v. Saunders*, 199 F.3d 968, 975 (8th Cir. 1999).

---

[12]    Plaintiff also claims that he was denied medical treatment for his insect bite. (Second Am. Compl. 2, 5.) At his deposition, however, Plaintiff admitted he received prompt and adequate treatment. (Bevins Dep. at 136:14–139:5.)

Plaintiff alleges that the Becker County Defendants violated due process by denying his "efforts to use the Jail's grievance system." (Second Am. Compl. 6.) Plaintiff does not have a protected liberty or property interest in the use of a jail's grievance procedure. *See Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993) ("A prison grievance procedure is a procedural right only, it does not confer any substantive right upon the inmates. Hence, it does not give rise to a protected liberty interest requiring the procedural protections envisioned by the fourteenth amendment."). Also, as discussed above, Plaintiff was not denied use of the prison grievance procedure. At most, he was prevented from using the first step of the procedure, but was not precluded from pursuing the remaining steps up the chain of command. Therefore, the Becker County Defendants should be granted summary judgment on this claim.

### 4.    Conspiracy

To prove a § 1983 conspiracy claim, a plaintiff must show: (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff. *Burton v. St. Louis Bd. of Police Comm'rs*, 731 F.3d 784, 798 (8th Cir. 2013). The plaintiff is additionally required to prove a deprivation of a constitutional right or privilege to prevail on a Section 1983 civil conspiracy claim. *Id.*

For the reasons set forth above, Plaintiff cannot prove that his constitutional rights were violated. Therefore, the Becker County Defendants are entitled to summary judgment on this claim.

22

### 5.    *Monell* Claim

A *Monell* claim is a § 1983 claim brought against a state or local governmental entity that has adopted some policy, custom, or practice that allegedly caused a violation of the plaintiff's constitutional rights. *Davison v. City of Minneapolis*, 490 F.3d 648, 659 (8th Cir. 2007). The entity "may be held liable under section 1983 . . . if one of its customs or policies cause the violation of plaintiff's constitutional rights." *Id.* (citing *Monell*, 436 U.S. at 690–91). This claim fails because, as discussed above, Plaintiff does not have a valid underlying claim that can survive summary judgment. *See Tichich v. City of Bloomington*, Civil No. 14-298 (DSD/SER), 2014 WL 3928530, at *5 (D. Minn. Aug. 12, 2014) (finding the municipality cannot be held liable for its employees' conduct unless the employees are "found liable on the underlying substantive claim") (citing *Abbott v. City of Crocker*, 30 F.3d 994, 998 (8th Cir. 1994)).

### D.    Federal Claims Against the St. Mary's Defendants

To prevail on his § 1983 claim against the St. Mary's Defendants, Plaintiff must prove that those who allegedly harmed him were acting under color of state law. *See Youngblood v. HyVee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001). In general, private individuals or entities do not act under color of state law for purposes of § 1983. *See Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 936 (1982). "[T]he state-action requirement reflects judicial recognition of that fact that most rights secured by the Constitution are protected only against infringement by governments." *Id.* Acts of a private party are "fairly attributable to the State," so as to be deemed "under color of state law" for § 1983 purposes, if "there is such a close nexus between the State and the

23

challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tennessee Secondary Sch. Ass'n*, 531 U.S. 288, 295 (2001). To be "fairly attributable to the state," the claimed deprivation must have "resulted from the exercise of a right or privilege having its source in state authority," and the party engaging in the deprivation must be "appropriately characterized as a state actor." *Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007). "This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the state." *Montano v. Hedgepeth*, 120 F.3d 844, 848 (8th Cir. 1997). Resolving this question "entails a journey down a particularly fact-bound path." *Id.*

The Supreme Court has held that medical treatment of prisoners by prison doctors who are under contract with the state to provide such care is fairly attributable to the state, and thus is state action for the purposes of § 1983. *See West v. Atkins*, 487 U.S. 42, 54–56 (1988). The St. Mary's Defendants, however, are not under contract to provide medical care to Becker County Jail inmates. (*See* Doc. No. 75, Affidavit of Peter Jacobson ("Jacobson Aff.") ¶ 3 (stating that "there is no contract between Becker County and St. Mary's Regional Health Center related to the treatment of inmates"); *see also* Doc. No. 149.) After *West*, courts have reached differing conclusions as to whether private physicians not under contract with the jail or prison facility can be considered state actors. *See, e.g.*, *Gallegos v. Slidell Police Dep't*, Civil Action No. 07-6636, 2008 WL 1794170, at *3 (E.D. La. Apr. 18, 2008) (finding no state action when "Plaintiff does not allege that the medical defendants treated him pursuant to a contract with a

24

government entity, and he apparently was not treated at a police station or jail but at a hospital"); *Anglin v. City of Aspen*, 552 F. Supp. 2d 1229, 1244 (D. Colo. 2008) (finding state action because the state "delegated its constitutional duties [to provide adequate medical treatment] to the professional judgment of others").

One case, applying the Eighth Circuit's "functional view of state action," held that a "private physician treating an inmate at a private facility utilizing his independent medical judgment is not answerable to the state and does not act under color of state law for purposes of § 1983." *Griffis v. Medford*, No. 05-3040, 2007 WL 2752373, at *6 (W.D. Ark. Sept. 20, 2007) (citing *Montano*, 120 F.3d at 850). This Court finds this reasoning persuasive for purposes of the instant case. In *Griffis*, there were "too few connections between the state and the defendants. Defendants had no contractual relationship with the state, no state doctor referred plaintiff to the facility, and there was no proof of an ongoing relationship between defendants and the jail." *Id.* Similarly here, there is no contract and no proof of an ongoing relationship between the Jail and the St. Mary's Defendants. Instead, it appears only that inmates, such as Plaintiff, were taken to Essentia Health facilities on an as-needed basis, and the doctors and health care professionals who treated Plaintiff did so in a private facility and exercised independent medical judgment. Ultimately, there is nothing in the record to suggest that these private individuals acted in concert with state officials, or that their conduct is otherwise chargeable to the state. *See Montano*, 120 F.3d at 848. Therefore, the actions of the St. Mary's Defendants are not fairly attributable to the State, and they should be granted summary judgment on Plaintiff's § 1983 claims against them.

###### E.    State Law Claims

Plaintiff also brings state law claims against both sets of Defendants. When, as here, all federal claims are dismissed before trial, it is within the Court's discretion to retain supplemental jurisdiction over any remaining state law claims for which jurisdiction does not otherwise exist. 28 U.S.C. § 1367(c)(3). There is a general preference for declining jurisdiction over state law claims, but a district court should consider and weigh several factors in determining whether to retain jurisdiction, including "judicial efficiency, convenience, and fairness to the litigants." *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir. 1990). Since these claims have been litigated and Plaintiff has not created any genuine issues of material fact, the Court concludes that it would be more efficient and fair to exercise jurisdiction over these claims.

 Plaintiff alleges that the Becker County Defendants were negligent. To prevail on a negligence claim, a plaintiff must show: "(1) the existence of a duty of care; (2) a breach of that duty; (3) an injury; and (4) that the breach of the duty was a proximate cause of the injury." *Fenrich v. Blake School*, 901 N.W.2d 223, 228–29 (Minn. Ct. App. 2017). Under Minnesota law, jailers have a duty of care to protect detainees from harm. *See Sandborg v. Blue Earth Cnty.*, 615 N.W.2d 61, 63 (Minn. 2000). Plaintiff has not presented any evidence of a breach of a duty of care. In addition, Plaintiff has not presented any evidence to suggest he was harmed. Finally, Plaintiff has offered no evidence that any breach of a duty proximately caused him injury. Summary judgment is appropriate when one party has presented no evidence sufficient to create a question of

fact with regard to an essential element of that party's claim. *Brooks v. Roy*, 776 F.3d 956, 960 (8th Cir. 2015).

Moreover, under Minnesota law, government officials are entitled to official immunity from state law claims when "the official's duties require the exercise of discretion or judgment." *Dokman v. Cnty. of Hennepin*, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001). A public official loses this protection only if he or she "commits a willful or malicious wrong." *Elwood v. Ricy Cnty.*, 423 N.W.2d 671, 677 (Minn. 1988). Decisions about when to bring Plaintiff to the hospital or seek medical treatment were discretionary decisions, and Plaintiff offers no evidence that the Becker County Defendants acted maliciously when making those decisions. The Becker County Defendants are therefore entitled to official immunity on this claim.

Plaintiff also alleges that the St. Mary's Defendants committed medical malpractice. "Expert testimony is generally required in medical-malpractice cases because they involve complex scientific or technological issues." *Mercer v. Anderson*, 715 N.W.2d 114, 122 (Minn. Ct. App. 2006) (citing *Tousignant v. St. Louis Cnty.*, 615 N.W.2d 53, 58 (Minn. 2000)). Discovery in this matter concluded on February 15, 2018, and Plaintiff stated in his discovery responses and deposition testimony that he has not contacted an expert to review his claims. (*See* Doc. No. 122, Affidavit of Janna Sagvold ("Sagvold Aff."), Ex. 2; Doc. No. 84; Sagvold Aff., Ex. 3, Bevins Dep. 177.) There are cases where expert testimony may not be required, but this is not such a case. *See Miller v. Raaen*, 139 N.W.2d 877, 880 (Minn. 1966) (explaining that expert testimony not required in "situations where there was no doubt about the cause of the result complained

of, and the result would not have followed in the absence of a breach of duty, the

establishment of which did not involve any scientific knowledge"). Plaintiff is not

alleging, for example, that medical equipment was left in his body after surgery. *See id.*

Instead, Plaintiff alleges that the St. Mary's Defendants ignored his medical condition

when discharging him back to the Jail and failed to follow-up on Plaintiff's medical care

after his discharge. These claims require expert testimony regarding Plaintiff's medical

condition when he was admitted and discharged, the standard of care, and whether

Plaintiff was injured due to a breach of the standard of care. *See Walton v. Jones*, 286

N.W.2d 710, 714 (Minn. 1979). Since Plaintiff did not provide evidence required to

prove his claim, the St. Mary's Defendants are entitled to summary judgment. *See*

*Bellecourt v. United States*, 784 F. Supp. 623, 637–39 (D. Minn. 1992) (granting

summary judgment on medical malpractice claims because plaintiff did not provide

expert testimony).[13]

### F.    Request for Subpoena

Plaintiff also filed a request to subpoena various people for trial. (Doc. No. 174.) If

the district court adopts this Court's recommendation that summary judgment be granted,

this request should be denied as moot.

---

[13]    Plaintiff filed a motion to appoint a medical expert. (Doc. No. 172.) This Court
denied Plaintiff's motion because Plaintiff's status as a litigant proceeding *in forma
pauperis* does not entitle him to affirmative assistance from the Court in litigating his
claims. (Doc. No. 173.) The Court also declined to appoint an expert under Federal Rule
of Evidence 706 because that rule provides for the appointment of a neutral expert and
does not contemplate the appointment of and compensation for an expert to aid one of the
parties. (*See id.*)

IV.    **Recommendation**

Based on the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

       1.      The spelling for Defendant Innovis Health, LLC be corrected on the docket;

       2.      The St. Mary's Defendants' Motion for Summary Judgment (Doc. No. 120)

be **GRANTED**;

       3.      The Becker County Defendants' Motion for Summary Judgment (Doc.

No. 126) be **GRANTED**;

       4.      Plaintiff's Request for a Subpoena (Doc. No. 174) be **DENIED**; and

       5.      Judgment be entered accordingly.


Date: October 30, 2018               *s/ Becky R. Thorson*_____
                                       BECKY R. THORSON
                                       United States Magistrate Judge


**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), a party may file and serve specific written objections to this Report within **fourteen days**. A party may respond to those objections within **fourteen days** after service thereof. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).